1 | Matthew C. Elstein, Esq., SBN 174400
2 | matt.elstein@gmail.com
3 | 1334 Sky Ridge Court
  | San Marcos, CA 92078
4 | (760) 277-7741
5 |
6 | Attorneys for Plaintiffs,
7 | STEPHEN FANTL, CHARLES "SCOTT" SOLOMON,
  | JODY WEAVER, DEBT DEFENSE SERVICES, LLC,
8 | CLEARING SOLUTIONS, LLC, and
9 | AWESOME ENTERPRISES, LLC

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN FANTL, an individual; CHARLES "SCOTT" SOLOMON, an individual; JODY WEAVER, an individual; DEBT DEFENSE SERVICES, LLC, a Maryland Limited Liability Company; CLEARING SOLUTIONS, LLC, a Delaware Limited Liability Company; and AWESOME ENTERPRISES, LLC, a Maryland Limited Liability Company,<br><br>Plaintiffs,<br><br>vs.<br><br>DAVID GLENWINKEL, an individual; CRAIG BELING, an individual; RAMIN AMIREBRAHIMI, aka "Ryan Amir," an individual; KRISTI CROWLEY, an individual; KATHY HELM, an individual; PURE SOLUTIONS, LLC, a Nevada Limited Liability Company; GLOBAL MANAGEMENT DEVELOPMENT, INC., a California Corporation; EXECUTIVE MANAGEMENT SOLUTIONS, INC, a California Corporation; PORTFOLIO MANAGEMENT GROUP. INC.. a | **COMPLAINT FOR:**<br><br>**(1) FRAUD**<br><br>**(2) NEGLIGENT MISREPRESENTATION**<br><br>**(3) BREACH OF CONTRACT**<br><br>**(4) PROFESSIONAL NEGLIGENCE**<br><br>**(5) BREACH OF FIDUCIARY DUTY**<br><br>**(6) RESCISSION**<br><br>**(7) CONVERSION AND TRESPASS TO CHATTELS**<br><br>**(8) QUANTUM MERUIT**<br><br>**(9) INTERFERENCE WITH EXISTING AND PROSPECTIVE ECONOMIC AND CONTRACTUAL RELATIONSHIPS** |

California Corporation; FIVE STAR MANAGEMENT, LLC, a Maryland Limited Liability Company; BELING & ASSOCIATES, a Texas Business Entity; ALLIANCE RETIREMENT TRUST OF DELAWARE, a Delaware Trust; SUMMIT FINANCIAL LLC, a California Limited Liability Company; and FIRST FIDELITY, a California Limited Liability Company,

Defendants.

1. Plaintiffs Stephen Fantl, Charles "Scott" Solomon, Jody Weaver, Debt Defense Services, LLC, Clearing Solutions, LLC, and Awesome Enterprises, LLC (collectively "Plaintiffs"), for their Second Amended Complaint in this action, allege as follows:

2. This Court has subject matter jurisdiction over this action pursuant to 28 USC Section 1332, in that this is an action between citizens of different stats wherein in the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.

3. Venue of this action is proper in this district under 28 USC Section 1391 in that a substantial portion of the events giving rise to the claims in this case arose in the Northern District of California.

### FACTS COMMON TO ALL CLAIMS FOR RELIEF

4. Defendant Ramin Amirebrahimi (aka Ryan Amir) introduced Defendant David Glenwinkel to Defendant Michael Gabor in the summer of 2014. Amir claimed Glenwinkel had been his "financial adviser" for a number of years related to tax matters and so-called "asset-protection strategies." At the time Gabor was working for Plaintiffs Awesome Enterprises and Five Star Management

5. Glenwinkel visited the offices of Awesome and Five Star in Maryland in August 2014. . During that visit he was introduced to Plaintiff Charles "Scott"Solomon. Solomon spoke to Glenwinkel at that time about his purported

expertise in financial advice, taxation, and asset protection.

6. During his meeting with Solomon, Glenwinkel claimed he was a renowned expert with extensive background in the debt invalidation industry, and that he wanted to help with the Solomon and Fantl's debt invalidation related businesses. He told Solomon he was one of the most sought after planners, tax advisors, and business developers in the world. He asked Solomon to send him information on Solomon and Fantl's debt invalidation businesses, and that he would look them over to see how he could be of assistance.

7. In September 2014, Solomon and Weaver sent Glenwinkel all the relevant information, operating agreements for the companies, books, and records. Scott and Jody also provided Glenwinkel with a detailed overview of how all the companies were structured – including, but not limited to, the incorporators of each company.

8. In late October of 2014, Solomon and Fantl were in Las Vegas on business and Glenwinkel was also there to see Mike Gabor. He met with Plaintiffs to provide his analysis of the information he had been provided. He told Scott and Stephen that, after looking through all the books and records, that it was an impressive business and that he could in fact assist Scott and Stephen in improving the business. He indicated that the cost would be $5,000 (five-thousand) a month. However, he would file the company tax returns for free.

9. His assistance for the $5,000 a month would include all corporate taxes, Scott's personal taxes, minutes for the corporations he felt were needed, and additional agreements between the other companies which 5 Star Management was doing business with - specifically Precision and Pure.

10. After various communications in November, Jody Weaver of 5 Star Management (the management company for DDS, Clearing, Pure, Precision, and AWESOME – Stephen and Scott's joint LLC) began paying Glenwinkel, via his company, Executive Management Solutions, in December of 2014, the $5,000 a

3

month. Payments of $5,000 a month continued through March of 2015 when Glenwinkel took control of the company's revenue stream, and the $1,000,000 reserve was sent to his company GMD (Global Marketing and Development).

11. Additionally, the money was deposited into a trust, the Alliance Retirement Trust through Wells Fargo. Fantl's name was supposed to be put on the trust account by Defendants -- however, this never happened.

12. An example of the untrue statements made by Glenwinkel is set forth in e-mail dialogue between Jody Weaver and Glenwinkel on November 17, 2014: "Thank you for the time and discussions last week, my aim is to have these returns structured this week, along with Mike's, and to wrap them out next week. Are there passwords to the QB Files? If you sent them previously I apologize in advance."

From: David Glenwinkel [mailto:david@taxcite.com]

Sent: Monday, November 17, 2014 3:28 PM

To: Jody Weaver

Cc: Scott Solomon; Dana Agosti; Kristi Crowley

Subject: Five Star Management Engagement

Hello Jody,

Thank you, and yes, please hold off on that company registration till you hear from me. For your FYI, I have copied Dana Agosti, our supervising CPA and our CFO Kristi Crowley on this email. Next week we will try to schedule a time just to connect us all on the phone so you can get to know them.

Kristi,

Please send Jody Weaver bank info per below. You can invoice them via pdf, and they will auto schedule the payment. …. recurring payment to you for $5,000.00 the 1st of each month. Please forward your banking information to me in order to create an ACH template

Five Star works closely, and shares office space with Michael Gabor, (Vant Capital) and they work with Ryan Amir. However, these are separate clients so just

4

a reminder to maintain that firewall in terms of information sharing. If there is ever an issue with cross referencing info, please run that through me.

DG

13. On February 11th and 12th of 2015 Glenwinkel flew to Denver to meet with Scott and Stephen to discuss his further analysis of the companies and to meet with Gabor. Additionally, he was also to meet with Ryan Amir, who was/is the principal of Pure. David told Scott and Stephen that, based on how he thought they were doing business, retention rates of clients, and the means by which Jody at 5 Star was keeping the books (backed up by e-mails) that Scott, Stephen and the Companies were in trouble.

14. The solution he proposed was to let him take over management of the companies, that he would assume and fix the liabilities of DDS, 5 Star, & Clearing. He also indicated that he would improve the customer service center, improve retention, and grow the business. He said if Scott and Stephen would sell him the companies, he would ensure that Scott and Stephen received the full value of the business as it was (the ongoing revenue stream) and have royalties (millions) on the new business that would be used in order to separate the business (referred to as back revenue stream) from the new business, called GMD. However, the ending result was Glenwinkel purchasing the rights to service the clients, leaving the liability and ownership of the companies with Scott and Stephen.

15. Glenwinkel, in conjunction with Craig Beling, put together an MOU immediately following the Denver meeting of February. There were communications back and forth regarding the MOU. Stephen and Scott's position was that the way Glenwinkel put it together was not appropriate and that he was not providing for the value of the business going forward. He told them he was the expert; that they didn't know what they were doing and that was the reason he had to come in and save them.

16. He also told Stephen and Scott he had taken DDS and Clearing and

placed/subsumed them into an older business ( Portfolio Group Management (PGM) - http://www.pgmfunds.com/) that had a lot of losses. He told them his company now owned DDS and Clearing for tax purposes. In an e-mail to Solomon and Fantl of March 6, 2015, Glenwinkel states in part "I am currently holding DDS as an asset of Portfolio Group Management Inc. which is my Parent Corporation." Additionally, on April 21st Glenwinkel sent to Fantl the "Resignation & Withdrawal" letter so Fantl could resign from Clearing, the acceptance of the resignation is signed David Glenwinkel, President, Portfolio Management Group. Also on April 21st, Glenwinkel sent to Fantl an Operating Agreement for Clearing back-dated to its inception wherein Fantl had been removed as the 100% Member, and replaced by Glenwinkel, his e-mail states "This does not require your signature, just fyi. I have ordered the Articles from SOS Maryland."

    17.    Regarding discussions leading up to the signing of the MOU, and Stephens position that he was not taking into consideration the value of the business model going forward Glenwinkel responded on March 3rd (MOU was done March 10th and became effective March 15th with the transfer of $1million to GMD):

> "I am certified under title 26 of the US Courts to provide expert testimony in matters of valuation both broadly speaking and specifically for residual income streams, and have been engaged well over a hundred significant valuations in cases of partner disputes, divorce, estate and criminal fraud over the past thirty years."

"I was the first US citizen to be certified by the Federal Court in San Francisco to value an international Hedge Fund subsequent to the stock crash of 08 in a case involving Swiss and Cayman mortgaged backed securities being sold to US Citizens. While I appreciate your comments below, it is obvious this is not your expertise."

"For the future book of business which commenced on March 11th, 2015 value to Solomon group was determined in the license fee. That was clear to all

1  parties. The license fee is the highest by far of any similar type of product I have
2  found but given the relationship and our future work together I accept it completely.
3  I opened additional matters for consideration after the understanding was signed per
4  the items below."

5  "We agreed that we have some shakedown work to do. On my side that
6  includes putting the operational house in order. Virtually none of the best practices I
7  expected to see are in place, and the accounting is poorly done and that is a kind
8  assessment."

9     18.    Stephen also indicated to David on March 3rd that the MOU was not
10  binding and that it was flawed because he could not have 5 Star effect the transfer of
11  the companies (DDS, Clearing, Precision and Pure) because 5 Star had no capacity
12  to do so and because the affiliates needed to consent to the transfer first which they
13  had not done, he responds in part to that:

14        "As to your comment on the legal standing of the MOA, "where the parties
15        have finalized all the terms of their agreement and intend to be bound
16        immediately but will put those terms in a form that is more precise (but no
17        different in effect), it is a legally binding instrument."

18        "There was a clear intent here to be legally bound, and I was clear in our
19        preliminary discussions on this point. Further, the significant terms of the
20        understanding have been executed." (They had not, but he said they were and
21        he'd sue of Solomon and Fantl if they backed out)

22        "I valued the old book of business within guidelines and considerations that
23        are common to this form of income stream. The total value of the stream
24        payable on an earn out, is $4.5 million plus 1.4 million (approximately) that
25        Mike is being paid out as a guarantee on my side which would have been
26        attributable to you. That totals 5.9 million."

27     19.    In a phone call from Stephen to David following the March 3rd e-mail,
28  Stephen told David that he did not think 5 Star as the transferring party of the MOU

has any legal capacity to transfer rights and value of companies as it was simply managing processing and funds. David was adamant that he has been developing companies for over 20 years, had a law degree, and knows better. To follow up in an e-mail (titled 5 Star – Solomon Agreement) of the same day (March 3rd) he states:

> "Dear Stephen and Scott,
>
> Although there are some documents yet to backfill here, I have attached my copy of a signed MOA/Agreement, the promissory note, signed, want to affirm here in this email with the summary below that I am agreed that we have a body of work completed that will allow us to move forward in the time table we discussed. I have added a clause for the payment of a royalty to Scott or his assigns through the expiration of the old book of business, commencing however in six months. I also included the summary below beneath our signatures. There are assignments and exhibits to complete, but I believe this will serve to get us in the process this week, with signatures tomorrow, and transfer and settlement of funds by mid week. I thank you very much for your kind patience in this process, and I look forward to a long and prosperous future together."

20. Between March 3rd and 10th Stephen Fantl and Glenwinkel had conversations where Fantl indicated he still didn't think what was happening was right. The reason Fantl indicated that he though what was happening was wrong was not to be argumentative, but that he truly felt that the methods by which the acquisition was happening were wrong and wanted them to be done correctly. Glenwinkel said they had a binding agreement now, "lawyer up if you don't like it." Scott and Stephen both felt that if they didn't follow through with the MOU then they would be sued. This was the same position Glenwinkel took in the e-mail of March 3rd where he stated "As to your comment on the legal standing of the MOA, "where the parties have finalized all the terms of their agreement and intend to be bound immediately but will put those terms in a form that is more precise (but no

different in effect), it is a legally binding instrument."

21. Also on March 3rd he reiterated to Stephen in an e-mail labeled Bless you, that he would cover their value:

> "we will create a simple formula, likely just based on a scalable royalty fee based on some (again simple) formula that is easy to measure and increases with volume, I like to weigh profit sharing, and owner level fees most heavily once the costs are met and profit efficiencies really kick in."

> "My thoughts on royalties should add millions to your plate if the numbers play out that I was toying with yesterday."

22. Fantl continued to object that 5 Star could transfer assets.

23. After all these discussions, David made a couple of minor changes and sent an MOU with Promissory note on March 8th. Part of that agreement was that DDS, Clearing and 5 Star collectively transfer $1,000,000 to GMD, which was done on the 10th of March to Alliance Retirement Trust. On the 15th of March, the revenue stream was redirected to GMD with payments coming from ACE business solutions to GMD.

24. The "Promissory Note," and ultimately a UCC filing David created as part of MOU, was made to 5 Star. He later claimed he had taken 5 Star as part of the overall deal, and subsequently dissolved it. So, he made a promissory note to a company he intended to take. Yet there is no record of a sale of 5 Star to GMD (even after multiple requests for such documentation). GMD also sold furnishings belonging to 5 Star.

25. Between March 15 and April 1, David had his associates calling multiple employees of 5 Star to gather information without informing Jody Weaver or Scott Solomon of these interrogations. On April 1, Kathy Helm, Craig Beling and David Glenwinkel came into the office in Maryland to transfer the employees from 5 Star to GMD. At no time did Glenwinkel's associates come to Jody or Scott to discuss the transfer of any of the employees.

26. At that time, Glenwinkel, Beling, and Amir started calling all of the affiliates and telling them that they had purchased all of the companies from Scott and Stephen/5 Star; they also told this to all of the employees. Scott and Stephen were still working in good faith under the MOU, while still telling David that he had not, in fact, purchased anything.

27. On April 9, they terminated the employment of Todd Lubar, who was the Operations Manager of the processing, customer service, and quality control department. David made an agreement to pay Todd $250,000 a month for 6 months [$1.5 million] (as a separation agreement) using the revenue stream he had acquired from Scott and Stephen - money that was to be for Scott and Stephen. He made one payment to Todd Lubar then sued Todd so he would not need to make any further payments. David also sued Mike Gabor so he would not have to pay Gabor the $1.4 million dollars he had previously agreed to. Scott and Stephen agreed Gabor was not entitled to the money as he was not doing any work. Scott and Stephen had been giving Gabor, from their revenue, approx. $150,000 a month in exchange for an interest in his hedge fund, which was run out of the same office as the debt companies.

28. After two weeks of Craig Beling unsuccessfully attempting to run the company as CEO of GMD, Glenwinkel brought in another person to act as COO – Bill Frado. Bill Frado was also unable to successfully run the company and seemingly had no idea what to do. Further, Marilyn Mazza and Nicole Jarkiewicz were instructed by Bill Frado on several occasions not to speak to Scott Solomon or Jody Weaver about anything business related, even though Scott Solomon and Jody Weaver still owned the companies. As a matter-of-fact, Frado went so far as to tell Mazza and Jarkiewicz that Scott did not own the company, was a "nice guy" but "horrible business person" and that the company was "going bankrupt" had GMD not taken over. Due to the inability of both Beling and Frado to provide and structured upper-management, several key employees left the company (namely

Dana Johnson and Frank Guevara).

29. Upon finding out Gabor was not being paid, Scott and Stephen indicated to David that the money should not be for David to keep. But rather, Scott and Stephen had earned it as part of the revenue stream. In a very contentious phone call in April between Stephen and David, Stephen told David "you cannot be promising Todd Lubar, or other people funds from our revenue stream," The only place the $1.5 million he had agreed to pay Lubar could come from was that revenue stream from the back book of business. David agreed.

30. The original verbal agreement that started the whole process back in February's discussions was based on David protecting and paying the entire revenue stream due to Scott and Stephen. Scott and Stephen based their decisions off of these promises made by David. To date, David has taken far more than he has given up.

31. David said Stephen and Scott had agreed to a "shakeout period" and that he would come up with a formula that would compensate Scott and Stephen more properly than the MOU, which would allow David to collect more up-front fees. On April 23 David sent an email entitled "Calculating Old Book of Business to Fantl, and Sandy Barnes. He stated: "For purposes of our formula, determining a profit share to apply to accelerated payments of the purchase price and tagging additional revenue share for the back book to enhance the total potential return to the sellers, a monthly number is what we need."

32. On April 24, 2015, e-mail "Resignation and Withdrawal": Glenwinkel states "I did prepare a memorialized transfer of Precision. No hurry. We have some time." He subsequently made Precision sign a direct agreement with GMD.

33. David and his attorney Craig Beling agreed to meet in Denver to do a new agreement on May 4th and 5th – essentially admitting that the previous MOU was null and void. He presented Scott and Stephen at the meeting with a variety of spreadsheets. In them he stated in April they received $1,043,672.24 and that the

cost to service the book transferred to him was $630,000. Therefore with also keeping money as a reserve, GMD could only give Scott and Stephen 19.36% of the revenue. The actual cost and what he was paying ACE is approx. $300,000 so David was pocketing for himself an additional approx. $330,000 a month which should rightly go to Stephen and Scott.

34. In this updated agreement of May 5th, Stephen and Scott via Awesome Enterprises received 25% of GMD for compensation of the value of the business model, clients, etc… What was always understood from day 1 in February was that David's value in this is that he would be getting 75% of the new company business (GMD) going forward. All the back revenue was to be sent to Stephen and Scott. David never paid a single penny in consideration, once he was given control. He paid Stephen and Scott approx. 15% ($166,000) a month from their own revenue stream, paid the costs of the business which were approx. $300,000 a month previous to his taking over, and he kept the rest.

35. During the May 5th agreement Stephen again brought up the issue of liability to the clients. This stemmed from David & Craig wanting to change the product, as part of the May 5 agreement. In section 5 it was agreed we would work together to make changes to the product; if the product doesn't work or is changed substantially to be something other than what people were sold. Stephen saw significant risk and David told Stephen that all liability was on Stephen and Scott. David claimed he had only "purchased" (with no money) the revenue stream but not the clients or company.

36. Stephen said he thought PGM was the owner of the companies. He gave some answer Stephen didn't understand about how it was only regarding taxes but not liability. That evening he sent an e-mail to Stephen and Scott entitled Privileged and Confidential Financial Disclosure Requirements": Glenwinkel states he is:

Memorializing a historical record to validate ownership of DDS and Clearing,

if only tax matters were the issue, is a common and relatively secure way of directing the tax toward the owner of record. However, this act becomes evidentiary to other authorities who may be conducting investigations in other matters such as criminal accusations or civil breaches that could amount to fines and penalties or more that will inure to the ultimate beneficial interest.

37. This is in direct contrast to the April 21st e-mail wherein he sent Stephen a document entitled "Resignation and Withdrawal" that had Stephen Resign from Clearing, that document was to be signed by David as the President of PGM.

38. At the May 5th meeting was Sandy Barnes of ACE. She was to do the actual servicing of the clients as David had no capacity and no people to actually "service" them since he had fired the entire staff in Maryland that had been handling such things. David and Craig Beling, almost a month later, finally made an agreement with Barnes after her telling them she was out if they continued playing games. Now, David and Beling are doing nothing to service the book of business transferred to them illegitimately by 5 Star and taking hundreds of thousands monthly. Even worse, they have caused substantial damage in their dealings with the affiliates. 50% of the business has left as they don't want to deal with David & Craig. David and Craig also informed the affiliates during the April transfer of employees, that GMD had purchased the company when, in fact, they had not. Additionally, they said that Scott and Stephen did not have a reserve put in place, which was the 1 million transferred to the Trust. Then, GMD told the affiliates that they (GMD) had a reserve put in place, when it was truly the 1 million in the Trust funded by Scott and Stephen. During the May 5 meeting, Stephen had inquired about the 20,000 paid to Executive Management Solutions (David's tax company). Glenwinkel said that money was not for the debt companies, but for the IT companies. David said his regular rate for "this kind of shit" (verbatim) was 100,000. However, Stephen and Scott do not own the IT companies, have no say in the financial side of the IT companies, and therefore could never have given David

13

permission to work for the IT companies – this leaves only the debt companies that David could have done anything for.

39. To make matters significantly worse, Beling then changed the product down to ½ a page dispute from what were 8 pages and worked 97% of the time; Fantl never agreed and has objected strenuously. The product is wholly insufficient and unacceptable, it is not what the clients paid for, and Beling was required by Section 5 of the agreement to work with Stephen as the creator and copyright holder on the paperwork. Stephen made several attempts between May 6 and June 9th to get Beling to work with him to change the product -Beling never replied to a single e-mail from Stephen. Now Stephen and Scott are left with the liability of the clients who no longer are receiving the service they paid for while Beling and David are collecting the vast majority of the money.

40. David had no right to Dissolve 5 Star. He then went and started selling 5 Stars furnishings.

## CLAIMS FOR RELIEF

The foregoing allegations, which are incorporated by reference, give rise to the following claims for relief:

A. Fraud and Negligent Misrepresentation against all Defendants -- All of the Defendants conspired to defraud Plaintiffs.

B. Breach of Contacts – If any valid and enforceable contracts are found to exist between Plaintiffs and Defendants, Defendants breached those contracts.

C. Professional Negligence – Defendants Glenwinkel, Beling, and their companies breached their professional duties to Plaintiffs.

D. Breach of Fiduciary Duty – Defendants Glenwinkel, Beling, and their

companies breach their fiduciary duties to Plaintiffs.

E. Rescission – The purported transfers made by Defendants were fraudulent, not supported by consideration, and should be adjudged as rescinded.

F. Conversion and Trespass to Chattels -- Defendants converted the real and personal property of Plaintiffs as detailed above.

G. Quantum Meruit – Defendants owe Plaintiffs restitutionary relief in quantum meruit.

H. Interference with Existing and Prospective Economic and Contractual Relations – Defendants mismanagement, fraud, and misrepresentations to third parties including affiliates destroyed Plaintiffs' businesses.

WHEREFORE, Plaintiffs on behalf of themselves and the claim pray for judgment against all Defendants as follows:

1. For monetary damages in excess of $50 million, to be proven at trial;

2. For attorneys' fees and costs; and

3. For such other relief as the Court deems just and proper.

DATED:

                                */s/ Matthew C. Elstein*
                        By: _____
                             MATTHEW C. ELSTEIN
                             Attorneys for Plaintiffs